IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ROBERT LEE WRIGHT,<br><br>    Defendant. | 4:19CR3036<br><br>**FINDINGS, RECOMMENDATION AND ORDER** |

On March 19, 2019, Robert Lee Wright ("Robert Wright") was indicted on two counts: Transportation of Child Pornography and Possession of Child Pornography. On May 22, 2019, a Superseding Indictment was returned adding two counts: Production of Child Pornography and Distribution of Child Pornography. ([Filing No. 19](#)). Defendant now moves to suppress all evidence and statements obtained as the result of a December 23, 2018, stop and search, arguing that he was subject to an unlawful expansion of a traffic stop in violation of his Fourth Amendment rights. (Filing Nos. 24, 25). For the reasons stated below, the motion to suppress should be denied.

STATEMENT OF FACTS

After hearing testimony, observing the witnesses as they testified, and reviewing the documentary and video evidence, the undersigned magistrate judge finds the following facts are credible:

Nebraska State Patrol Trooper Warren Gibson is trained to visually estimate speed to an accuracy of plus or minus five miles per hour. His cruiser was equipped with a radar speed measurement device the trooper uses to confirm his visual speed estimates. The radar equipment was calibrated and properly working when

the December 23, 2018 traffic stop occurred, and it works when the cruiser is stationary or moving.

On December 23, 2018, Gibson was traveling eastbound on Interstate 80 in a marked cruiser. Gibson observed a Nissan Altima with Georgia license plates traveling westbound on Interstate 80 in Hamilton County, Nebraska. The posted speed limit was 75 miles per hour and Gibson estimated the Altima was traveling in excess of 85 miles per hour. Using his radar equipment, Gibson confirmed the Altima was traveling 88 miles per hour. Gibson watched the Altima pass, entered the median to turn around, and then watched as the Altima exited the interstate at mile marker 332. Gibson activated his vehicle's emergency lights and initiated a traffic stop. The Altima pulled onto the shoulder and stopped.

Gibson approached the passenger side of the car and observed two occupants. The front-seat passenger was later identified as Defendant Robert Wright, and the driver was later identified as Ashlee Wright, the defendant's wife.

As he approached and stood by the Altima, Gibson noticed there were various bags and containers in the back seat, including a green "ammo can," a book bag, retail store bags, a soft-sided tool bag, and a cooler. Upon seeing the ammo can, Gibson suspected the occupants may be hauling ammunition or other items that "go along with firearms." ([Filing No. 29](Filing No. 29)). Gibson also observed a radar detector attached to the windshield. He could see that it was plugged in and the display was turned on. Gibson observed that Robert Wright had a fixed-blade knife in a sheath on his hip. Ashlee Wright said there was a knife in the door. ([Filing No. 29](Filing No. 29), Exhibit 1)

Gibson informed Ashlee Wright that she was stopped for speeding. The officer asked for her license, registration, and proof of insurance. Ashlee Wright

told Gibson that the vehicle was rented, and the rental agreement was on her phone. As reflected in that rental agreement, Ashlee Wright did not rent the Altima, but she was an authorized driver. Robert Wright was not an authorized driver. Ashlee Wright told Gibson that the rental agreement was in her mother's name. Ashlee Wright's mother was not in the vehicle.

Gibson asked Ashlee Wright to exit the Altima and be seated in the patrol car. Gibson noticed Ashlee Wright was very nervous and shaking, and he asked her why she was shaking so much. Her first response was, "I am cold," explaining it was cold in her car because the air "helps [her] stay more alert." Gibson had not noticed any cold air when he approached the open passenger's side window. Gibson again Ashlee Wright if she was shaking because she was cold in her vehicle. This time, she explained, "There's a hereditary condition that my grandmother and my dad has that causes us to shake a little bit." When Gibson asked what the hereditary condition was, Ashlee Wright stated she could not remember its name. Gibson asked if she was claiming her shaking was due to the hereditary condition, even though she did not know what the hereditary condition was. Ashlee Wright responded, "I've never been diagnosed."

Gibson questioned why Ashlee Wright exited the interstate after the traffic stop was initiated. She stated that she did not need fuel and that she was planning to go to the truck stop to make a sandwich from ingredients in the cooler in the back of the Altima. Gibson inquired about the radar detector. Ashlee Wright said it belonged to Robert Wright, and she was not familiar with how it worked. But when questioned by Gibson, Robert Wright said he did not know how to operate the radar detector, noting he had heard it alert prior to the stop.

Gibson asked Ashlee Wright about her travel plans. The rental car was picked up in Tennessee. According to Ashlee Wright, she and Robert Wright were

driving approximately 20 hours from Tennessee to Cheyenne, Wyoming on December 23, 2018, to pick up Ashlee Wrights' nephew. The officer's own online research during the stop indicated the trip would actually take close to 25 hours. Ashlee Wright explained that they planned to stop at a friend's house to shower and freshen up, and then immediately turn around and take the nephew back to Tennessee to see his daughter, hoping to arrive in Tennessee before Christmas breakfast. Then, one or two family members, possibly Robert and Ashlee Wright, were going to drive the nephew back to Wyoming, and again immediately drive back to Tennessee to return the rental car. The car was due to be returned by noon on Thursday, December 27. Ashlee Wright explained that her nephew just started a new job and did not have the money to get from Cheyenne to Tennessee, and he did not have a car; Robert Wright acknowledged the trip plans were unusual, but the nephew needed the Wrights' transportation assistance because he is incompetent.

Gibson asked about the friend the Wrights would contact in Cheyenne. Ashlee Wright provided two different last names for this friend, later explaining one name was a maiden name and the other a married name. Robert Wright stated he did not know the friend's last name.

Gibson asked Ashlee Wright about the couple's employment statuses. She stated she is a stay-at-home mom to a 13-year old daughter, and Robert Wright runs a company with his father providing painting services. She stated she did not know the name of her husband's employer.

After approximately one-half hour, Gibson completed the traffic stop, provided Ashlee with a citation and answered her questions about it. He asked if she had a minute for some questions and she replied "Yeah." (Exhibit 1: 00:24:35)

Gibson again verified the Wrights' travel plans and informed Ashlee Wright that his duties include locating illegal items that are transported through Nebraska on the Interstate. Gibson asked her for consent to search the vehicle. Initially she said there was nothing illegal in her vehicle, there was just "so much stuff." Then she said that she preferred that he ask her husband. (Exhibit 1: 00:26:30). She repeatedly deflected the question, stating that there was nothing illegal in the vehicle and asked why the officer wanted to search the vehicle. (Exhibit 1: 00:26:00-00:28:00) Ultimately, she declined the search. (Exhibit 1: 00:28:00)

Gibson asked for her consent for a drug detection canine to conduct a sniff of the vehicle. (Exhibit 1: 00:28:00) Ashlee Wright did not answer the question. Gibson informed her that he interpreted her "silence as a no", and that she would be detained. (Id. at 00:29:15)

Gibson requested a Nebraska State Patrol K9 unit to come to the location of the traffic stop. An off-duty Trooper, Justin Davis, was called. About five minutes later, dispatch informed Gibson that Davis was en route. Davis had to travel approximately 35 miles from his residence to the site of the traffic stop. Davis and his service dog, J.D., are a certified narcotics detection team, and they arrived approximately 45 minutes after they were requested. J.D. is a dual-discipline canine trained in finding and apprehending humans, as well as marijuana, methamphetamine, cocaine, and heroin. ([Filing No. 30](Filing No. 30)). Davis deployed J.D., who alerted and indicated on an odor of narcotics emanating from the vehicle. Gibson and Davis conducted a search of the Altima.

During the search of the vehicle the troopers found methamphetamine and drug paraphernalia. (Exhibit 102, p. 5). They also found numerous electronic devices, electronic storage media (hard drives, flash drives, SD cards, micro SD cards), six cellular phones, and three tablets. (Exhibit 102, pp. 5-6). The Wrights

were arrested for possession of a controlled substance (methamphetamine) and drug paraphernalia. (Exhibit 102, p. 6).

Ashlee Wright signed a waiver of *Miranda* rights, and submitted to an interview by Nebraska State Patrol Investigator Kayla Farrell December 23, 2018. During that interview, Ashlee Wright said the storage devices possibly contained recordings of TV shows and home-made pornographic videos of her and Robert Wright. (Exhibit 102, pp. 6-7). She confessed to stealing a laptop from a Menards store in Lincoln. She also stated that her cell phone was stolen by Robert Wright in Cleveland, Tennessee earlier in the year.

After being advised of his *Miranda* rights and signing a *Miranda* waiver, Robert Wright was interviewed. He admitted that the electronics in the vehicle were his, confessed to stealing the laptop from the Lincoln Menards store, and stealing multiple items from a Wal-Mart in another state. He provided a statement admitting that the majority of the electronic devices seized from the vehicle were his personal property. (Exhibit 101, Exhibit 102)

Farrell obtained a search warrant through the County Court for Hamilton County for data contained on the three cell phones found in the vehicle. A search of the SD card removed from one of the cell phones contained over 1100 photos and over 120 videos. Many images appeared to be child pornography, including images of a female child under the age of 12 preparing to perform oral sex on a male. (Exhibit 101, p. 8). NSP Investigator Giffee transferred data to the National Center for Missing and Exploited Children, which responded that 12 of the 1100 plus photos are graphic images or videos of known child pornography with known victims. (Exhibit 101, p. 8)

While housed in Hamilton County, Robert placed numerous phone calls which were subject to monitoring and recording. The content of some of the jail calls was presented in an affidavit supporting an application for a search warrant on March 19, 2019. (Exhibit 102). The affidavit alleged that in certain calls Robert Wright admitted or alluded to engaging in or filming sexual acts with children. (Exhibit 102, pages 13, 15).

At the hearing, the government offered Exhibit 2, a selection of the jail calls made by Robert Wright which purportedly provided usernames and passwords for third party access to child pornography. ([Filing No. 30 at 00](Filing No. 30 at 00):32:00). Robert Wright objected to the exhibit on relevance. The undersigned magistrate judge took the matter under advisement and reserved ruling on the admissibility of this exhibit. (Id. at 00:33:00)

Exhibit 1 was received at a hearing on Gibson's motion to suppress on August 7, 2019. Exhibit 1 contains the video footage of the inside and outside of the cruiser captured on December 23, 2018, during the stop of the Altima. (Exhibit 1, [Filing No. 29](Filing No. 29))

ANALYSIS

In his motion, Robert Wright asserts that Gibson conducted an unlawful expansion of the traffic stop in violation of the Fourth Amendment. Robert Wright further asserts that the search was conducted "without a valid consent and without any reasonable or articulable suspicion or probable cause to search said vehicle which violated his rights under the Fourth Amendment to the United States Constitution." ([Filing No. 24 at CM/ECF p. 2](Filing No. 24 at CM/ECF p. 2)). He asserts that any statement obtained from him following his allegedly illegal detention is fruit of the poisonous tree, and therefore must be suppressed. (Id.) Further, he asserts that any warrant

obtained to search the electronic devices seized is also "tainted fruit," because the "warrant applications are based primarily upon information obtained through the illegal search." (Id. at p. 3).[1]

I. Standing

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. Defendants who move to suppress evidence based on an alleged Fourth Amendment violation have a threshold burden of showing a reasonable expectation of privacy in the area searched or the items seized. Rawlings v. Kentucky, 448 U.S. 98, 104–05 (1980); Rakas v. Illinois, 439 U.S. 128, 143 (1978); Katz v. United States, 389 U.S. 347, 361 (1967).

Robert Wright can assert a violation of his Fourth Amendment rights only if he can demonstrate a legitimate expectation of privacy as a passenger of the car driven by Ashlee Wright. See U.S. v. Green, 275 F.3d 694 (8th Cir. 2001). It is well-established that "Fourth Amendment rights are personal rights that may not be asserted vicariously." United States v. Anguiano, 795 F.3d 873 (8th Cir. 2015), citing United States v. Barragan, 379 F.3d 524, 528–29 (8th Cir. 2004). An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his

---

[1] Robert Wright does not challenge the initial stop of the vehicle. Evidence was presented that the Altima was traveling in excess of the posted speed limit, a violation of Neb. Rev. Stat. 60-682.01(1). This violation was sufficient to establish that the initial traffic stop was supported by probable cause. (See United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) ("An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation).

Additionally, Robert Wright does not challenge the canine sniff, or the search of the vehicle. He asserts only that the statements and evidence obtained after the allegedly impermissible expansion of the traffic stop are fruits of the poisonous tree.

expectation is reasonable. Id. The ownership, possession and/or control of the area searched or item seized is relevant to the analysis. U.S. v. Gomez, 16 F.3d 254 at 256 (8th Cir. 1994). The United States Supreme Court has explicitly determined that a mere passenger does not have standing to challenge a vehicle search where he has "neither a property nor a possessory interest in the automobile." Rakas v. Illinois, 439 U.S. 128, 148-49 (1978).

Robert Wright cannot show any possessory or privacy interest in the car. As a passenger in a rented car he was not authorized to drive, he does not have the right to challenge the search of the car. He does, however, have standing to challenge the seizure and detention of his person.

II. Prolonging the Seizure

Robert Wright argues that after the citation was issued, Gibson did not have "at least a minimal level of objective justification for prolonging the seizure." See Filing No. 25 at CM/ECF p. 4, citing United States v. Stringer, 739 F. 3d 391 (8th Cir. 2014).

Once a stop is initiated, "it should last no longer than is necessary to dispel the officer's suspicions." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (citing United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)). "[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir.1993); United States v. Richards, 967 F.2d 1189, 1193 (8th Cir. 1992)). And an officer may verify the information provided by the driver by questioning other occupants of the vehicle. United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) (citing

United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)). A reasonable stop may also include completing "a number of routine but somewhat time-consuming tasks[,]" including "checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." Anguiano, supra, citing Barragan. Once this initial investigation and the purpose of the stop are complete, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting Jones, 269 F.3d at 925).

Requesting consent to search after the purpose of a stop has concluded does not violate the Fourth Amendment. Long, 532 F.3d 791 at 795. The scope of a stop can be expanded, "If reasonably related questions raise inconsistent answers . . . a trooper's suspicions may be raised so as to enable him to expand the scope of the stop to ask additional, more intrusive, questions." United States v. Ward, 484 F.3d 1059, 1062 (8th Cir. 2007) If "the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." Id.

In this case, Ashlee Wright sat in the patrol vehicle and discussed the purpose and duration of the trip with Gibson while he examined the rental agreement and checked the Wrights' criminal histories and drivers' licenses. Gibson also spoke briefly with Robert Wright about the purpose and length of the trip. Gibson returned to the cruiser and completed the stop by issuing a citation.

Gibson answered Ashlee Wright's questions about the citation and then said "You can have a safe trip, ok?" (Ex. 1: 31:58). Ashlee Wright reached for the door handle to exit the cruiser and then Gibson requested, and received, consent to ask additional questions.

Gibson and Ashlee Wright discussed the Wrights' travel plans and then Gibson asked for consent to search the vehicle, which she denied. Gibson asked for consent for a canine to perform a free air sniff of the vehicle. She did not respond. Gibson informed Ashlee that he was taking her silence as denial of the request and that he would detain her and Robert Wright until the canine arrived to perform the sniff.

"[O]nce an officer finishes the tasks involved with the traffic violation the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued encounter is consensual." United States v. Englehart, 811 F.3d 1034, 1041 (8th Cir. 2016) (internal quotations omitted) "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and, unlike a routine check of a driver's license or insurance card, conducting a dog sniff is not "an ordinary incident of a traffic stop." Rodriguez v. United States, _ U.S. _, 135 S.Ct. 1609, 1615 (2015) (internal quotation omitted). Therefore an officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id.

Reasonable suspicion exists if the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)(citations omitted). The court looks to the totality of the circumstances when determining whether reasonable suspicion exists. Id. "[B]oth innocent and criminal acts can create reasonable suspicion." United States v. Juvenile TK, 134 F.3d 899, 903 (8th

Cir. 1998) (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)). Whether certain acts contribute to a finding of reasonable suspicion is determined by viewing them in light of the law enforcement officer's experience and training. United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990)(internal citations omitted); Beck, 140 F.3d at 1136. However, the officer's suspicion cannot be based on a mere hunch or circumstances which "describe a very large category of presumably innocent travelers." Id. (citing Reid v. Georgia, 448 U.S. 438, 440–41 (1980)).

Wright argues that "All Trooper Gibson had was a hunch based on short interactions with the Wrights during the traffic stop." (Filing No. 25 at CM/ECF p. 4)(citing Terry v. Ohio, 392 U.S.1, 2-23 (1968) (stating hunches cannot provide the basis for reasonable suspicion of criminal activity)). He argues that the Wrights' account of the facts and circumstances of their trip were consistent, and Ashlee Wright's nervousness cannot "supply reasonable suspicion." (Filing No. 25 at CM/ECF p. 4). He argues that, taken as a whole, the circumstances known to Gibson at the time of the stop fall short of establishing the reasonable suspicion necessary to justify further detention after the traffic stop tasks were completed. Therefore, he argues the evidence seized and statements made as a result of the alleged unlawful detention should be suppressed.

Gibson has approximately 12 years of law enforcement experience and has taken criminal interdiction classes. With this training and experience, Gibson considered multiple aspects of the traffic stop suspicious, including the following facts:

1) The Wrights exited the interstate as soon as Gibson's patrol vehicle turned around. Gibson testified that vehicles commonly do this in attempt to avoid being stopped.

2) The Wrights were traveling in a rented vehicle, but the renter was not accompanying them on the trip. In addition, it was a very long trip over a short period of time, but Robert Wright was not authorized to assist Ashlee Wright with driving.

3) Neither occupant provided proof of insurance.

4) Gibson considered the overall travel plan to be unusual, even considering the special circumstances during the holidays. The Wrights were traveling a long distance from Tennessee to Wyoming and then planned to immediately turn around and return Tennessee with Ashlee's nephew as a passenger. They did not provide an accurate estimate of how long the trip would take. Ashlee Wright's nephew would spend only a short amount of time in Tennessee before someone would have to drive back to Wyoming with him, as the rental car had to be returned in Tennessee only two days after Christmas.

5) Ashlee Wright stated the nephew was purportedly not renting the vehicle from Cheyenne and returning it there after Christmas because he lacked finances; Robert Wright stated the nephew was incompetent.

6) The travel plans were made at the last minute. Gibson stated that it is common for those engaged in trafficking to make last-minute travel plans.

7) Ashlee Wright provided inconsistent statements as to the last name of the person with whom the Wrights planned to stay in Cheyenne, and Robert Wright did not know the name.

8) Ashlee Wright was talking fast, and she exhibited extreme nervousness and shaking throughout Gibson's initial encounter with her.

9) Ashlee Wright provided inconsistent explanations for why she was shaking; initially stating she was cold due to the air conditioning in the vehicle (on a 45-degree December day), and then claiming she had a hereditary condition that she could not identify, ultimately stating she had never been formally diagnosed.

10) Ashlee Wright stated she did know the name of her husband's employer despite having been married to Robert Wright for 13 years.

11) Neither Ashlee nor Robert Wright claimed ownership of the radar detector in the rental vehicle or admitted knowing how to use it.

A detention is unreasonably prolonged if the defendant was detained beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion. United States v. Donnelly, 475 F.3d 946 (8th Cir. 2007). While Robert Wright argues that Gibson lacked reasonable suspicion to prolong the traffic stop, based on the totality of the circumstances and the credible testimony of the law enforcement officers, the undersigned magistrate judge finds Gibson had reasonable suspicion that Robert and Ashlee Wright were involved in criminal activity; specifically, illegal drug activity. The officers did not violate Defendant's Fourth Amendment rights by prolonging the traffic stop to investigate those suspicions. See e.g., United States v. Coleman, 4:10CR3108, affirmed in 700 F.3d 329 (8th Cir. 2012), citing United States v. Suitt, 569 F.3d 867 (8th Cir. 2009) (finding evasive and incomplete answers gave the officer reasonable suspicion to prolong the traffic stop for additional questioning); United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009) (finding that extreme nervousness, multiple cellphones, and inconsistent stories generated reasonable suspicion); Jones, 269 F.3d at 929 (explaining that nervousness combined with other more revealing facts can generate reasonable suspicion); see also United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995)(finding that suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion).

In this case, that suspicion justified requesting a canine to perform a sniff of the vehicle. Gibson requested the canine sniff within minutes of concluding the initial investigation. None of the cities or counties nearest to the stop had an available canine unit and Davis, located in Grand Island, was the closest canine handler to the stop. Even though Davis was off-duty and on vacation when he

received the call from dispatch, he immediately put his uniform on, put J.D. into his car, and drove the 35-mile trip to the scene. Under the circumstances presented, the 45-minute delay while awaiting the arrival of a canine was not unreasonable. United States v. Bloomfield, 40 F.3d 910, 916–17 (8th Cir.1994). (en banc) (finding a 60-minute delay for canine unit was not unreasonable).

I conclude Gibson had reasonable suspicion to further the investigation. Robert Wright was not unlawfully or unreasonably detained.

III. The Search of the Vehicle

Once the canine unit arrived and J.D. was deployed, he alerted and indicated to the presence of narcotics in the vehicle. Robert does not challenge the canine sniff or the search of the vehicle. Nonetheless, I find that there was probable cause to search the vehicle without a warrant based upon the canine's alert and indication. (See United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (If probable cause exists, an officer can lawfully search a vehicle without a warrant.)) (See, also, United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999). ("A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable.")).

Robert Wright's basis for challenging is that the expanded detention following the initial stop of Ashlee's rental car was unlawful. Having found that Robert Wright's Fourth Amendment rights were not violated, the undersigned magistrate judge further finds that the evidence obtained as a result of the detention of Robert Wright at the scene of the traffic stop—including his statements and evidence from the electronic devices seized and searched pursuant to warrants—cannot be suppressed.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to [28 U.S.C. § 636](b), that the motion to suppress filed by the defendant ([Filing No. 24](#)) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on **September 23, 2019**, or as soon thereafter as the case may be called, for a duration of five (5) trial days. Jury selection will be held at the commencement of trial.

September 6, 2019.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge